NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230372-U

NO. 4-23-0372

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 20, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 19JA86 |
| v. | ) | |
| Stephanie H., | ) | Honorable |
| Respondent-Appellant). | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court granted appellate counsel's motion to withdraw and affirmed
              the trial court's judgment terminating respondent's parental rights.

¶ 2         On April 24, 2023, the trial court entered an order terminating the parental rights of

respondent, Stephanie H., to her child, M.T. (born in April 2011). Respondent appealed. Appellate

counsel now moves to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), on the

basis that she cannot raise any potentially meritorious argument on appeal. Counsel's notice of

filing and proof of service indicate she sent a copy of her motion and brief to respondent by mail.

We granted respondent until July 14, 2023, to file a response. No response was filed. After

reviewing the record and counsel's brief, we grant counsel's motion to withdraw and affirm the

court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4          On November 8, 2019, the State filed a petition for adjudication of wardship regarding M.T. The petition alleged the minor was neglected and/or abused by respondent mother. M.T.'s father is deceased. The State alleged M.T. was present during a domestic-violence incident in June 2019 between respondent and her boyfriend, Kevin H. The Illinois Department of Children and Family Services (DCFS), through the services of Quincy Catholic Charities, opened an intact family case implementing a safety plan. The plan prohibited Kevin from being in the home due, in part, to his ongoing methamphetamine use. During unannounced visits between June 2019 and November 2019, the caseworker discovered respondent had been allowing Kevin to be in the home and, on multiple occasions, she had attempted to hide him in a bedroom. Kevin's probation officer reported a positive drug test for methamphetamine in September 2019 and several failures to appear through September and October 2019. He refused to engage in domestic-violence or substance-abuse services. Respondent also failed to participate in services.

¶ 5          On January 26, 2021, the trial court entered an adjudicatory order, finding the minor neglected on the grounds alleged. On March 15, 2021, the court entered a dispositional order, finding respondent unfit to parent the minor and making her a ward of the court.

¶ 6          On August 30, 2021, because it appeared respondent had made sufficient progress and reportedly had had no contact with Kevin, the trial court entered an order terminating wardship, restoring custody and guardianship of M.T. to respondent, and closing the case. However, within days, the guardian *ad litem* filed a motion to reconsider, claiming "new concerns," misinformation, and respondent's "active attempts to mislead [the] parties" justified the court's reconsideration of the order closing the case. After considering the evidence and arguments of counsel, the court vacated its order and reinstated wardship but allowed respondent

to maintain custody of M.T., with DCFS as guardian. Respondent was ordered to not allow Kevin to (1) be within 1000 feet of her residence or (2) have any direct or indirect contact with M.T.

¶ 7            In October 2021, the guardian *ad litem* requested the trial court vacate its "return home" order due to evidence that Kevin was residing with respondent and M.T. The court agreed, and the minor was again removed from the home.

¶ 8            On January 23, 2023, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent had (1) failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child (750 ILCS 50/1(m)(i) (West 2022)) and (2) failed to make reasonable progress toward the return of the minor during any nine-month period following adjudication (*id.* § 1(D)(m)(ii)). The State relied on three nine-month periods to support its allegations of unfitness: (1) January 26, 2021, through October 26, 2021; (2) October 27, 2021, through July 27, 2022; and (3) July 28, 2022, through April 28, 2023.

¶ 9            On April 3, 2023, the trial court held a termination hearing. Delaney McDonald testified she was the child welfare specialist assigned to this case between August 2020 and December 2021. According to the November 2020 case plan, respondent was to cooperate with the agencies and providers, participate in combined mental-health/domestic-violence treatment, maintain a substance-free lifestyle, successfully complete a parenting course, and participate in visitation. In April 2021, when the case plan was evaluated, respondent's progress was rated as satisfactory, and M.T. was returned home in June 2021.

¶ 10          McDonald testified her recommendation that M.T. be returned home due to respondent's satisfactory progress was based on the assumption that respondent was in compliance with the trial court's order prohibiting her from having any contact with Kevin. The problem with Kevin being in the home, or involved with the family at all, was not only his reputation as a "severe

drug user" and frequent domestic-violence abuser, but also M.T.'s limited and primarily nonverbal communication skills due to autism. M.T.'s inability to effectively communicate posed a significant risk factor. McDonald explained that, if M.T.'s safety was in jeopardy, she would be unable to effectively express that danger. According to McDonald, this barrier enhanced the importance of respondent's duty of maintaining a safe household.

¶ 11     In late August 2021, after the case was closed, McDonald learned respondent had been in contact with Kevin. In October 2021, McDonald witnessed Kevin in the presence of respondent and M.T. This was when the case was reopened and M.T. was again removed from the home.

¶ 12     Caseworker Sarah Goodapple testified she was assigned the case from November 2021 through August 2022. She created respondent's case plan dated May 20, 2022. Respondent's primary task was "cooperation and participation." For the time period of November 2021 through May 2022, respondent was rated unsatisfactory on this task because she had not been honest about her relationship status and, in February 2022, respondent admitted that Kevin had been residing in her home. Respondent was also to participate in combined mental-health and domestic-violence counseling. Again, she was rated unsatisfactory due to her failure to advise her providers that Kevin "was back in [respondent]'s life."

¶ 13     Goodapple testified respondent was rated satisfactory on her parenting and visitation tasks. She had successfully completed the parenting course and "was doing great in her visits with [M.T.]" Respondent was also rated satisfactory on her substance-abuse task. She had completed the assessment, and no further services were recommended.

¶ 14     Goodapple testified that, despite respondent's success at parenting and visitation, M.T. was still at risk because Kevin was "not a safe person to have in the home." According to

Goodapple, respondent could not explain why she chose to violate the trial court's order of no contact, but she had told Goodapple that Kevin had left the home in February 2022 after staying only "a few nights."

¶ 15　　Caseworker Thomas Miller testified he was assigned the case after Goodapple in August 2022. Miller created the case plan dated November 7, 2022. Respondent's goals remained "cooperation and participation," combined mental-health/domestic-violence treatment, parenting and visitation, separate mental-health treatment, maintaining a substance-free lifestyle, and maintaining a violence-free lifestyle. Respondent received a satisfactory rating on "cooperation and participation," parenting and visitation, and maintaining a substance-free lifestyle. She was rated unsatisfactory on two tasks: (1) the combined mental-health/domestic-violence treatment due to her dishonesty with the provider and (2) the new mental-health task because it had been recommended she change providers due to her dishonesty with the original provider, but she never did.

¶ 16　　Miller testified that an updated case plan dated only nine days later, on November 16, 2022, was necessary after "a critical decision was made to suspend visits." Miller said there were changes in M.T.'s behaviors after visits with respondent, in that she "was becoming more aggressive." The foster family reported to him that M.T. slammed doors, refused to get dressed, and was "just becoming more and more of a challenge." She had "started becoming aggressive to the family animals." Miller said M.T. "started to kick the dog and [would go] after the cat." The trial court agreed to suspend visits and, as a result, M.T.'s behavior improved.

¶ 17　　Before resting its case, the State asked the trial court to take judicial notice of (1) the January 26, 2021, adjudicatory order; (2) the March 15, 2021, dispositional order; (3) the September 3, 2021, order directing respondent to not allow Kevin within 1000 feet of her residence

or to have any direct or indirect contact with M.T.; (4) the October 28, 2021, order vacating the remain-home goal; and (4) Adams County case No. 19-CM-189, in which Kevin pleaded guilty to domestic battery against respondent.

¶ 18 Respondent presented the testimony of JoAnn O'Rourke, her mental-health/domestic-violence therapist. O'Rourke testified she began seeing respondent when she was employed at SIU Center for Family Medicine between January 2020 and April 2021, at which time O'Rourke switched to Quincy Medical Group. Due to the switch, there was a lapse in respondent's treatment as she waited for insurance recertification, and O'Rourke was unavailable until February 2022. O'Rourke testified that, in November 2022, she spoke with a caseworker who expressed concerns about respondent's honesty. O'Rourke wrote a letter outlining respondent's positive progress related to her employment, available transportation, attendance at her appointments, and her understanding of boundaries and the impact of domestic violence.

¶ 19 On cross-examination, O'Rourke testified the basis for her belief that respondent had demonstrated improvement was respondent's remorse. According to O'Rourke, respondent was "very hurt that she misses her daughter and what has happened to her daughter."

¶ 20 After considering the evidence and arguments of counsel, the trial court found the State had proved respondent was unfit "by not only clear and convincing evidence but by overwhelming evidence." The court found respondent's apparent progress during the initial nine-month period alleged "was not progress at all due to [respondent] being untruthful with the caseworkers because having continued to maintain contact with [Kevin] in spite of the Court's prior orders" of no contact. After M.T. was removed from respondent's care the second time, in October 2021, respondent was unable to demonstrate progress "that she had moved on from [Kevin]" and that she would be able to maintain a safe living environment for M.T. The court

recognized M.T. was a "special needs minor" who "need[ed] *** specialized treatment and care because of her medical and emotional circumstances." The court addressed the "critical decision" to suspend visits due to M.T.'s aggressive behavior and noted respondent never requested that M.T. be returned to her care or that visits be unsupervised. The court recognized respondent's acknowledgement that she had been dishonest with the caseworkers regarding her involvement with Kevin after the no-contact order was in place. Yet, the court noted, after M.T.'s removal from the home the second time, respondent was never able to demonstrate credible progress such that the agencies would consider returning M.T. to respondent's care.

¶ 21　　　　　On April 24, 2023, at the best-interest hearing, the trial court considered testimony from then-current caseworker Miller. He said M.T. had "severe autism, intellectual issues, [and] limited speech capabilities." When M.T. was removed from respondent's care the second time, she was placed in her current foster home, which was capable of meeting her needs, and things had been "going very well." He said M.T. typically uses a device that helps her communicate, but the device was not needed in the home because, according to Miller, "they have such a solid connection that the talking device is not used." Miller had visited the foster home at least twice a month and had seen the strong bond between M.T., the foster mother, and the biological 16-year-old daughter in the home. M.T. was doing well in school "for somebody in [her] position." Miller testified all of M.T.'s emotional, physical, and medical needs were being met in the home and the foster mother had expressed her desire to adopt M.T.

¶ 22　　　　　The trial court found the State had shown by a preponderance of the evidence that the termination of respondent's parental rights would be in M.T.'s best interest. The court noted the testimony established M.T. was bonded to the foster family; her needs, including her special needs, were being met in the home; the home appeared to be safe and appropriate; M.T. was in

school on a regular basis; and the foster home was a potential permanent placement. The court changed the goal to adoption.

¶ 23        This appeal followed.

¶ 24                                  II. ANALYSIS

¶ 25        On appeal, appellate counsel seeks to withdraw on the basis she cannot raise any arguments of potential merit.

¶ 26        The procedure for appellate counsel to withdraw set forth in *Anders* applies to findings of parental unfitness and termination of parental rights. *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000). Under this procedure, counsel's request to withdraw must " 'be accompanied by a brief referring to anything in the record that might arguably support the appeal.' " *Id.* (quoting *Anders*, 386 U.S. at 744). Counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why [s]he believes the arguments are frivolous." *Id.* Counsel must then conclude the case presents no viable grounds for appeal. *Id.* In doing so, counsel should review both the unfitness finding and the best-interest determination and indicate in the brief that he or she has done so. *Id.* at 685-86.

¶ 27        In this case, counsel asserts she has reviewed the record on appeal, including the report of proceedings of the termination hearing, and has concluded there are "no viable grounds for appeal." Counsel asserts she considered raising the arguments (1) the trial court erred by admitting the case plans into evidence during the fitness hearing without a proper foundation, (2) the court erred in admitting and relying upon the hearsay evidence in the case plans, (3) respondent's counsel provided ineffective assistance of counsel, (4) the court's fitness finding was against the manifest weight of the evidence, and (5) the court's best-interest determination was not supported by the statutory best-interest factors. We address each argument in turn and

ultimately agree with counsel's conclusion there are no issues of arguable merit to be raised on review.

¶ 28                                    A. Finding of Parental Unfitness

¶ 29          Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Pursuant to section 1(D)(m)(i), (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2022)), a parent may be found unfit if she fails "(i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor ***, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." "A trial court's determination that a parent's unfitness has been established by clear and convincing evidence will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Gwynne P.*, 215 Ill. 2d at 354. The State need only sufficiently prove one ground of unfitness to support the termination of parental rights. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83.

¶ 30          Here, the State alleged respondent was unfit under both subsections—for failing to make reasonable efforts and reasonable progress. The State alleged respondent's unfitness could be proved during any one of three nine-month periods: (1) January 26, 2021, to October 26, 2021, (2) October 27, 2021, to July 27, 2022, or (3) July 28, 2022, to April 28, 2023. See 750 ILCS 50/1(D)(m)(i), (ii) (West 2022). The trial court found the State had established the allegations of unfitness by clear and convincing evidence. We agree.

¶ 31          This case began in June 2019, after respondent's boyfriend, Kevin, battered her in

M.T.'s presence. Kevin was arrested and convicted of domestic battery as a result of this incident. An intact case was opened and a safety plan was put in place. In November 2019, when it was discovered respondent had violated the safety plan by allowing Kevin in the home, M.T. was removed from respondent's care. By August 2021, it seemed respondent had made progress in her case and had not allowed Kevin to have contact with her. M.T. was returned to respondent's care and the case was closed.

¶ 32     However, only days after the case's closure, and during the first alleged nine-month period, in August 2021, DCFS, or its authorized agents, discovered respondent had allowed Kevin into the home. In fact, on October 26, 2021, Kevin was at M.T.'s school to pick her up. M.T. was again removed from respondent's care. Respondent admitted she had allowed the prohibited contact.

¶ 33     At the fitness hearing, the trial court stated there was "no evidence that [respondent] had ever been able to make the decision that [Kevin] was no longer to be a part of her household and because of that, she was never able to show progress with regard to being able to maintain a safe living environment for the minor." The court found the State had sufficiently proved respondent unfit on the grounds alleged. Given this evidence alone, the State clearly demonstrated respondent had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child and had failed to make reasonable progress toward the return of the child to her care.

¶ 34     Based on our review of the record, we find the trial court's finding of unfitness was not against the manifest weight of the evidence. Further, we agree with appellate counsel's assessment of this issue as one not worthy of appeal.

¶ 35                    B. Counsel's Performance

¶ 36        Appellate counsel also indicates she considered arguing that trial counsel rendered ineffective assistance when she failed to object to inadmissible hearsay or evidence lacking a proper foundation. However, because the caseworkers testified to personally observing several instances of respondent having contact with Kevin, and because respondent admitted to such contact, any challenge to counsel's failure to object to potentially inadmissible evidence would be without merit, as the result of the proceedings would not have been different. See *People v. Cherry*, 2016 IL 118728, ¶ 24 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (Our supreme court noted that an ineffective-assistance-of-counsel claim is precluded if the defendant cannot establish a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.).

¶ 37                             C. Best-Interest Determination

¶ 38        When a trial court finds a parent to be unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to

substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best[-]interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 39 At a best-interest hearing, the State must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the minor. *D.T.*, 212 Ill. 2d at 366. On review, "[w]e will not disturb a court's finding that termination is in the [minor's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 40 In the instant case, while the trial court did not expressly reference section 1-3(4.05) of the Act, it explicitly considered the statutory factors set forth in that section. Specifically, the court considered the facts that (1) M.T. needed specialized care, (2) the foster home was equipped to handle M.T.'s special needs, (3) M.T. had a strong bond with her foster mother and sibling, (4) M.T. was comfortable, safe, and secure in the home, (5) the foster family was meeting all of M.T.'s physical, emotional, and mental needs, and (6) the foster mother expressed her desire to provide M.T. with a permanent and stable placement. Given this evidence, we conclude the court's best-interest finding was based on an appropriate consideration of the statutory factors and was not against the manifest weight of the evidence. Again, we agree with counsel that no reasonable argument challenging the court's best-interest finding could be made on appeal.

¶ 41                                          III. CONCLUSION

¶ 42 For the reasons stated, we allow appellate counsel to withdraw and affirm the trial

court's judgment.

¶ 43　　　　Affirmed.